STEARNS v. GRAND TRUNK RAILWAY CO.

SALES—CONTRACTS—PERFORMANCE—DELIVERY.

Plaintiffs contracted for the sale of certain lumber, to be thereafter cut, at an agreed price per thousand. Under the terms of the contract, when the lumber was cut the purchaser was to go to the mill and make an estimate of the same; that payments were to be made based on such estimates; and that the lumber was to be finally inspected by the purchaser and the payments adjusted according to the final inspection. When the estimates and payments were made, the purchaser wrote the firm name upon the piles of lumber and insured the same in the name of the purchaser with the plaintiffs' knowledge and consent. Part of the lumber was shipped to the purchaser upon its order, and the last car load plaintiffs shipped to their own order with bill of lading and draft attached. *Held,* that title to the lumber passed to the purchaser upon the payments made upon the estimates, and that plaintiffs by their action in shipping the last car load in their own name could not maintain an action for the amount of the draft against the carrier for an unlawful delivery to the purchaser.

Error to Oakland; Smith, J. Submitted January 19, 1909. (Docket No. 110.) Decided March 30, 1909.

Assumpsit by Charles T. Stearns and Edgar F. Stearns, copartners as Stearns Brothers, against the Grand Trunk Railway Company for the amount of a sight draft attached to a bill of lading. There was judgment for plaintiffs, and defendant brings error. Reversed.

*Trevor & Bumps*, for appellant.

*Andrew L. Moore*, for appellees.

BROOKE, J. This case has already been before this court. See *Stearns* v. *Railway Co.*, 148 Mich. 271. The statement of facts contained therein was sufficient for the determination of the matters raised by that record. It is necessary, however, to supplement it for the purpose of determining the matters in issue now before the court.

Plaintiffs were manufacturers of lumber at Pontiac, Mich., and made a contract with Scranton & Co., of Detroit, for the sale of certain lumber to be thereafter cut, at an agreed price per thousand. The contract between the parties was that, when the lumber was cut, Scranton should go to Pontiac and make an estimate of the same from time to time; that payments were to be made by Scranton & Co. to the plaintiffs upon such estimate; that the lumber was ultimately to be inspected by Scranton & Co., and, if the estimated payment was found to be too little, the balance should be paid by Scranton & Co. to the plaintiffs, and, should it turn out that the estimated payments were too large, the plaintiffs were to return the amount of overpayment to Scranton & Co. Whether the lumber was to be inspected in Detroit or in Pontiac, is in dispute between the parties. All the lumber to be cut under the contract was finally cut and piled in the plaintiffs' yard at Pontiac, and estimated from time to time by Scranton, and payment therefor made according to the estimate, to the amount of $1,319.51. At the time the estimates were so made, as before stated, Scranton wrote his firm name in various places upon the piles of lumber, and thereafter insured it, with the knowledge and consent

of the plaintiffs, in the name of Scranton & Co.   No insurance was placed upon the lumber by plaintiffs for their benefit.   No final inspection of the lumber was made in Pontiac.   Three car loads thereof were shipped by the plaintiffs to Scranton & Co. to Detroit upon their order. The last car load, about which the dispute herein arose, was shipped by plaintiffs to their own order in Detroit, with bill of lading and draft for $116.68 attached.   Scranton & Co. refused to pay the draft, but secured the delivery of the car load of lumber to them by the defendant company, and are defending this action on behalf of the defendant.

We quote briefly from the testimony of Andrews, who was a partner in the plaintiffs' concern at the time of the dealings in question, as follows:

" When Mr. Scranton estimated the piles he said:   ' It was his lumber.'   Mr. Stearns and I agreed to it, and he said that in the event of anything happening to us, that if any trouble would occur, that he claimed that lumber to be his, and we agreed to that; that it was proper, and, when it came to final scaling or inspection, whatever difference was coming to us was to be paid.

"*Q.* You did not have a right to sell the lumber to anyone else ?

"*A.* No, sir.   He wrote his name on the piles, and I think put the date on the piles.   *   *   *   Now, I want the jury to understand that, besides agreeing to it, I went on and made a reservation at the same time.   The first time that he went up there to estimate this very first pile he said:   ' This is my lumber.'

"*Q.* And wrote his name over it ?

"*A.* Yes; so he would have perfect title to it if any trouble came up to us.   It was his lumber.   He made the remark then and there that he was to have the title.   I want the jury to understand that there was a reservation.   And he said that was all right.   I was at three estimates made by Mr. Scranton after the first one, and every time he made the statement that ' this is my lumber,' and we agreed to it.

"*Q.* And, after agreeing to it, you said, ' But the title does not fully [pass] until you have made the final settlement ?'

"*A.* I do not think we said that on every time at all.

"*Q.* How many times did you say it?

"*A.* The first time when he came out there.   I cannot recall that we said it but once.   Stearns and I talked the matter over thoroughly.

"*Q.* Did he, Stearns, say that 'the title does not pass until complete title, until you have made final settlement?'

"*A.* Yes; so did he."

The plaintiff Stearns testified in part as follows:

"I said, 'It would overrun his estimate,' and Mr. Scranton said: 'Very well, when the lumber is inspected and if you see it overruns, I will pay the difference, and, if it underruns, you will pay me the difference.' After Mr. Scranton estimated the lumber, he figured it up, and paid us the price upon the estimated quantity.   He wrote his firm name in various places upon the piles of lumber, in my presence, and said: 'So there may be no difficulty about this matter in case anything should happen, this is my lumber.' He did not say he took possession of it, but said it was his lumber, 'This is my pile of lumber,' and paid us the estimated price for it.   *   *   *

"*Q.* And without your objection to it.   That is right, is it not?

"*A.* No, sir.   Not without my objection.   I told him it was his lumber when the balance was paid.

"*Q.*   *   *   *   Do you mean to tell this jury that you was saying that to him, that which you have just now stated?

"*A.* I do.   That first car load.

"*Q.* Did you object when Mr. Scranton says, 'This is my lumber,' when he said that at the very first pile?

"*A.* Yes, sir; I did."

The first question presented by this record is whether or not the title to the lumber passed to Scranton & Co. at the time of the payment of the $1,319.51, the identification of the same by them by writing their name upon the various piles, the conversation which occurred between the parties, and by the subsequent acts of the parties. We are of the opinion that the title did so pass.   It is not disputed that the ultimate settlement was to be made upon a final inspection to be made by Scranton & Co.

either in Pontiac or Detroit. The fact that the plaintiffs had already shipped three car loads of the lumber without inspection in Pontiac is a circumstance strongly tending to show that the plaintiffs themselves believed that the inspection should take place at Detroit, as claimed by Scranton & Co. It is entirely obvious, from all the testimony contained in the record, that the estimated price paid by Scranton & Co. was intended to be the full value of the lumber sold, as nearly as it could be ascertained by the method used. But, in order that the rights of both the vendees and vendors should be protected, a careful inspection by the vendees was agreed upon. The declaration of the vendees of absolute ownership of the lumber, when estimated and marked in the presence of the vendors and the acquiescence therein by the vendors, seems to us to put this question beyond dispute. The insuring of the lumber by the vendees in their own name, with the knowledge and consent of the vendors, while it was standing in pile in Pontiac, and the failure of the vendors to insure any possible interest which they might have therein, is likewise an important factor. It is to be noted that, at the time the lumber was so estimated by Scranton & Co., paid for by them, marked with the firm name, and insured by that firm, there remained no act to be done by the vendors in connection therewith except to load the same on cars as ordered by the vendees. No inspection thereof was to be made by the vendors at either Pontiac or Detroit thereafter. In piling the lumber, the vendors had assumed to grade it in accordance with the terms of the contract, which was 60 per cent. better than common. Their act, therefore, in assuming dominion over the last car load, as evidenced by their shipment of the same to their own order after shipment had been directed by Scranton & Co., was an invasion of the vendees' rights. If the inspection of the lumber by Scranton & Co., whether in Detroit or in Pontiac, was fraudulent or unfair, the plaintiffs had their remedy; but by their own acts they had parted with the title to the property and

their dominion over it. If their contention is now just, they could, of course, have sold the lumber to another person, disregarding the rights of Scranton & Co. in the premises. Upon the facts disclosed by this record, such a conclusion is clearly untenable.

A case much like the case at bar was discussed by Judge Cooley in *Whitcomb* v. *Whitney*, 24 Mich. 486. The contract in that case was as follows:

"Detroit, March 16th, 1871.

"Received of D. Whitney, Jr., five hundred dollars on account for all the upper qualities and select common and cutting up or fine common lumber that I make at Rock Falls in town of Sand Beach, Michigan, this season, at fair price, what said Whitney can afford to pay; the lumber is to be delivered on rail of vessel when lumber is ready to ship, or when vessel is ready to send for it."

While the lumber was piled on dock it was destroyed by fire. Plaintiff sued for its value, and the court said:

"What is the case here? The contract is for the purchase of all the lumber of certain grades that plaintiff shall manufacture at Rock Falls during the season. The plaintiff could not have sold a foot of it to any other person without a distinct violation of his contract obligations. From the time of its manufacture nothing would need to be done to determine the right of the defendant in any particular parcel but to have it properly settled that it fell within one of the grades contracted for. An agent duly authorized had determined that as to all the lumber in question, and had done what amounted to an acceptance of it on the part of the defendant. It had then been set apart and stored in a proper place for the defendant, and was subject to his order. Nothing remained to be done by the plaintiff except to deliver it on the rail of the vessel, and that he could not do until the vessel was sent. Everything now depended on the action of the defendant, which might be expedited or delayed as should suit his own convenience.  *  *  *  In *Olyphant* v. *Baker*, 5 Denio (N. Y.), 382, it is said to be 'a general rule of the common law that a mere contract for the sale of goods, where nothing remains to be done by the seller before making delivery, transfers the right of property, although the price has not been paid, nor the thing sold delivered

to the purchaser.' And of the numerous cases in which the expression is used, that, if anything remains to be done by the seller, the title does not pass, Selden, J., in *Terry* v. *Wheeler*, 25 N. Y. 525, said they only go to the length of showing that where something is to be done by the seller to ascertain the identity, quantity or quality of the thing sold, or to put it in the condition which the terms of the contract require, the title does not pass. And he therefore holds with the approval of the whole court that an agreement by the vendor of lumber to transport it to the cars and deliver it free of charge did not prevent the title passing immediately where that was sold and selected and designated."

See, also, *Adams Mining Co.* v. *Senter*, 26 Mich. 73; *Webster* v. *Anderson*, 42 Mich. 554. The case at bar is, in our opinion, much stronger than the one we quote from. What was sold here was not only selected and designated, but was marked with the name of the vendee, and was paid for in full as nearly as could be then determined, and was afterwards insured by the vendees in their name.

It follows, therefore, that the learned circuit judge should have given defendant's sixth request to charge, which was as follows:

"I charge you that it is the undisputed testimony in this case that Stearns Bros. consented to Mr. Scranton placing the name of his firm upon the pile of lumber; that it was held subject to his order of shipment; that it was insured by him in his firm name with the knowledge and consent of Stearns Bros.; that Stearns Bros. had no right to sell it to any person; that it was estimated and the estimated value paid by Scranton & Co.; that as a matter of law these facts constitute a complete bargain and sale to Scranton & Co., and your verdict must be no cause of action."

The other errors assigned are not discussed.

Reversed, and new trial ordered.

GRANT, MONTGOMERY, MOORE, and MCALVAY JJ., concurred.